# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | |
| Arkan Mohammed ALI, et al., | Civ. No. 05-1378 (TFH) |
| **Plaintiffs,** | |
| v. | |
| Donald H. RUMSFELD, Secretary of Defense of the United States of America, | |
| **Defendant.** | |

## DEFENDANT'S AND THE UNITED STATES' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendant Secretary of Defense Donald H. Rumsfeld and the United States hereby move to dismiss all six causes of action in Plaintiffs' Consolidated Amended Complaint.[1]  Plaintiffs' first and second causes of action, which seek damages for alleged constitutional violations under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), fail to state claims for which relief may be granted.  Plaintiffs' third, fourth and fifth causes of action, which seek damages for alleged violations of international law must be dismissed because this Court lacks jurisdiction over them.  Plaintiffs' fifth cause of action is also subject to dismissal for failure to

---

[1]    Although the United States is not a named defendant in the related *Ali* actions pending in this Court, the United States has been substituted, pursuant to 28 U.S.C. § 2679(d)(1), as the defendant on the international law claims in Plaintiffs' third, fourth, and fifth causes of action in place of Secretary Rumsfeld and the three senior Army officers who are named defendants in the related actions.  *See* Ex. 1 to Memorandum of Points and Authorities (Certifications of Scope of Employment).  The related actions brought by some of the Plaintiffs against the three senior Army officers are:  *Ali v. Sanchez* (No. 05-1380), *Ali v. Karpinski* (No. 05-1379), and *Ali v. Pappas* (No. 05-1377).

state a claim.  Finally, Plaintiffs lack standing to pursue their sixth cause of action for declaratory

relief.  The grounds for dismissing Plaintiffs' claims are set forth in the accompanying

memorandum of points and authorities.  A proposed order is attached.


Dated:  March 6, 2006                    Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         NEIL M. GORSUCH
                                         Principal Deputy Associate Attorney General

                                         JEFFREY S. BUCHOLTZ
                                         Deputy Assistant Attorney General

                                         TIMOTHY P. GARREN
                                         Director
                                         Torts Branch, Civil Division


                                         _____/s/_____
                                         J. MARCUS MEEKS (D.C. Bar No. 472072)
                                         Trial Attorney
                                         UNITED STATES DEPARTMENT OF JUSTICE
                                         Torts Branch, Civil Division
                                         P. O. Box 7146
                                         Ben Franklin Station
                                         Washington, D.C. 20044
                                         (202) 616-4176 (voice)
                                         (202) 616-4314 (fax)

                                         Attorneys for Defendant Secretary of Defense
                                         Donald H. Rumsfeld and the United States

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Iraq and Afghanistan Detainees Litigation | |
| Arkan Mohammed ALI, et al., | Civ. No. 05-1378 (TFH) |
| Plaintiffs, | |
| v. | |
| Donald H. RUMSFELD, Secretary of Defense of the United States of America, | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S AND THE
## UNITED STATES' MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

NEIL M. GORSUCH
Principal Deputy Associate Attorney General

JEFFREY S. BUCHOLTZ
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director, Torts Branch, Civil Division

J. MARCUS MEEKS
Trial Attorney, Torts Branch, Civil Division

UNITED STATES DEPARTMENT OF JUSTICE
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, D.C. 20044

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION, WHICH ALLEGE VIOLATIONS
        OF CONSTITUTIONAL RIGHTS, SHOULD BE DISMISSED ON BOTH SPECIAL FACTORS
        AND QUALIFIED IMMUNITY GROUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Special Factors Preclude the Creation of an Implied Right of Action Under
                the Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Qualified Immunity Bars Plaintiffs' Constitutional Claims . . . . . . . . . . . . . . . 16

II.     SECRETARY RUMSFELD AND THE RELATED-ACTION DEFENDANTS ARE ENTITLED
        TO ABSOLUTE IMMUNITY ON PLAINTIFFS' THIRD, FOURTH, AND FIFTH CAUSES
        OF ACTION ALLEGING INTERNATIONAL LAW VIOLATIONS . . . . . . . . . . . . . . . . . . . 26

III.    PLAINTIFFS' FIFTH CAUSE OF ACTION FAILS BECAUSE THE GENEVA CONVENTION
        DOES NOT GIVE RISE TO JUDICIALLY ENFORCEABLE RIGHTS . . . . . . . . . . . . . . . . . 31

IV.     PLAINTIFFS LACK ARTICLE III STANDING TO SEEK DECLARATORY RELIEF . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

CASES:

*32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797 (D.C. Cir. 2002) . . . . . . . . . . . . 26

*Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003),
     *rev'd on other grounds sub nom. Rasul v. Bush*, 542 U.S. 466 (2004) . . . . . . . . . . . 20, 21

*Alexander v. Sandoval*, 532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003),
     *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . 29

*Anderson v. Creighton*, 483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

*Arar v. Ashcroft*, __ F. Supp. 2d __, 2006 WL 346439 (E.D.N.Y. 2006) . . . . . . . . . . . . . 8, 9, 14

*Bailey v. Bd. of County Comm'rs of Alachua County, Fla.*,
     956 F.2d 1112 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Bancoult v. McNamara*, 370 F. Supp. 1, 13 (D.D.C. 2004),
     *appeal docketed*, No. 05-5049 (D.C. Cir. Feb. 22, 2005) . . . . . . . . . . . . . . . . . . . . *passim*

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Behrens v. Pelletier*, 516 U.S. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bell v. Wolfish*, 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,
     403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

*Brosseau v. Haugen*, 543 U.S. 194 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Buie v. Jones*, 717 F.2d 925 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*Bush v. Lucas*, 462 U.S. 367 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10, 12

*Carlson v. Green*, 446 U.S. 14 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chappell v. Wallace*, 462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 37, 38

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) . . . . . . . . . . . . . . . . . . . . . 4, 11, 13, 14

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003),
       *cert. denied*, 540 U.S. 1104 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Davis v. Passman*, 442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Dist. No. 1, Pacific Coast Dist. v. Maritime Admin.*, 215 F.3d 37 (D.C. Cir. 2000) . . . . . . . . . 7

*Dorman v. Thornburgh*, 955 F.2d 57 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346 (Fed. Cir. 2004),
       *cert. denied,* 125 S. Ct. 2963 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Emory v. Peeler*, 756 F.2d 1547 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
       28 F.3d 1268 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FDIC v. Meyer*, 510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Federal Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961 (D.C. Cir. 1995) . . . . . . . . . . . . 34

*Fraternal Order of Police v. Rubin*, 134 F. Supp. 2d 39 (D.D.C. 2001) . . . . . . . . . . . . . . . . . 34

*Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hamdan v. Rumsfeld,* 415 F.3d 33 (2005),
       *cert. granted*, 126 S. Ct. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26, 31, 32

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

iii

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 22

*Head Money Cases*, 112 U.S. 580 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hirabayshi v. United States*, 320 U.S. 81 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hope v. Pelzer*, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005),
    *appeal docketed*, No. 05-5124 (D.C. Cir. Mar. 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . 25

*Jackson v. United States*, 730 F.2d 808 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174 (D.C. Cir. 2004),
    *cert. denied*, 125 S. Ct. 1299 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kentucky v. Graham*, 473 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C.),
    *appeal docketed*, No. 05-5063 (D.C. Cir. Mar. 4, 2005) . . . . . . . . . . . . . . . . . . . . . *passim*

*Knox v. McGinnis*, 998 F.2d 1405 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Malley v. Briggs*, 475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Martin v. Sargent*, 780 F.2d 1334 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*McIntosh v. Turner*, 861 F.2d 524 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*McNeil v. United States*, 508 U.S. 106 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 4

*Nelsen v. King County*, 895 F.2d 1248 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*North Dakota v. United States*, 495 U.S. 423 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) . . . . . . . . . . . . . 6, 26

*Rasul v. Bush*, 542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 24

*Rasul v. Rumsfeld*, __ F. Supp. 2d __, 2006 WL 266570 (D.D.C. Feb. 6, 2006) . . . . . . . . *passim*

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . 10, 11, 12, 14

*Saucier v. Katz*, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

*Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004),
    *aff'd*, 412 F.3d 190 (D.C. Cir. 2005),
    *petition for cert. filed*, 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743) . . . . . . . . . *passim*

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005),
    *petition for cert. filed*, 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743) . . . . . . . . 9, 10, 27

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 14

*Scott v. District of Columbia*, 139 F.2d 940 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 36

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . 33

*Stewart v. McGinnis*, 5 F.3d 1031 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28, 31

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . . . 20

*United States v. Passaro*, No. 04-cr-211 (E.D.N.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Smith*, 499 U.S. 160 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

*United States v. Stanley*, 483 U.S. 669 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . 7, 8, 11, 20

*Util. Air Regulatory Group v. EPA*, 320 F.3d 272 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . 34

*Van Tu v. Koster*, 364 F.3d 1196 (10th Cir.),
    *cert. denied*, 125 S. Ct. 88 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*,
    820 F.2d 1359 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wilson v. Layne*, 526 U.S. 603 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Zadvydas v. Davis*, 533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Zweibon v. Mitchell*, 720 F.2d 162 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**U.S. CONSTITUTION:**

Art. I, § 8, cls. 1, 11-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Art. II, § 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Art. III, § 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Art. VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**STATUTES:**

Alien Tort Statute, 28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27

Auth. for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) . . . . . . . . . 7

Auth. for Use of Military Force, Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002) . . . . . . . 7

Federal Employees Liability Reform and Tort Compensation Act of 1988,
    28 U.S.C. § 2679(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27-29
    28 U.S.C. § 2679(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27, 30

Federal Tort Claims Act,
    28 U.S.C. § 2675(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 30, 31
    28 U.S.C. § 2680(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 31

Nat'l Def. Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163,
    119 Stat. 3136 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15, 24

Ronald W. Reagan Nat'l Def. Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375,
    118 Stat. 1811,

10 U.S.C. § 801, stat. note § 1091(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
10 U.S.C. § 801, stat. note § 1092 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 2340A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 2340A(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**FEDERAL REGULATIONS AND RULES:**

28 C.F.R. § 15.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 38

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 38

**OTHER AUTHORITIES:**

151 Cong. Rec. S14260-62, -67, -69, -73 (daily ed. Dec. 21, 2005) . . . . . . . . . . . . . . . 12, 13, 24

Geneva Convention Relative to the Protection of Civilian Persons in Time of War,
    Aug. 12, 1949, 6 U.S.T. 3516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33

Geneva Convention Relative to the Treatment of Prisoners of War,
    Aug. 12, 1949, 6 U.S.T. 3316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33

Restatement (Third) of the Foreign Relations Law of the United States § 907
    cmt. a (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## INTRODUCTION

Since the terrorist attacks of September 11, 2001, the United States has pursued military action in Afghanistan and Iraq.  In the course of these military campaigns, which continue today, the United States and its allies have captured thousands of individuals.  Just as in virtually every major armed conflict in the Nation's history, the military has determined that many of those taken into custody should be detained during hostilities.  Such detention serves the vital objectives of gathering intelligence to further the overall war effort and preventing combatants from continuing to aid our enemies.

Plaintiffs are nine aliens who allege they were detained at various military facilities in Afghanistan and Iraq in 2003 and 2004.  Plaintiffs claim that the conditions of their detention are actionable on novel tort theories, and they seek to recover damages personally from Secretary of Defense Donald H. Rumsfeld (as well as, in three related actions also pending in this Court, from three senior Army officers).  Plaintiffs assert that actions taken by Secretary Rumsfeld caused them to be held in harsh conditions in violation of their alleged constitutional and international law rights.  In addition to damages, Plaintiffs also seek a declaratory judgment.

This motion seeks dismissal of all of Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Plaintiffs' first and second causes of action alleging violations of the Fifth and Eighth Amendments should be dismissed under the "special factors" doctrine formulated in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny.  Plaintiffs' constitutional tort claims raise grave separation of powers concerns that counsel against the creation of such claims in this novel and sensitive context.  The judiciary has never implied a *Bivens* claim in circumstances presenting war powers and national security

1

concerns remotely similar to those existing here.  Plaintiffs' constitutional tort claims should also

be dismissed on qualified immunity grounds because, as this Court recently recognized in a

similar case,[1] Plaintiffs have not alleged the violation of any clearly established constitutional

right.

Plaintiffs' third and fourth causes of action, which seek damages under the Alien Tort

Statute, 28 U.S.C. § 1350 ("ATS"), for alleged violations of the "law of nations," and their fifth

cause of action, which seeks damages under the Geneva Convention, should be dismissed on

absolute immunity grounds under the Federal Employees Liability Reform and Tort

Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (codified in part at 28 U.S.C. §§

2671, 2674, 2679) (hereinafter "*Westfall* Act").  That Act bars suits against federal officials for

conduct performed within the scope of their employment except for claims for violations of the

Constitution or of federal statutes.  28 U.S.C. § 2679(b).  Plaintiffs' sole tort remedy for claims

covered by the *Westfall* Act is an action against the United States under the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80.[2]  Plaintiffs, however, are barred from pursuing an

action against the United States under the FTCA because they have not exhausted the required

administrative remedies, 28 U.S.C. § 2675(a), and because their claimed injuries occurred in a

---

[1]    *See Rasul v. Rumsfeld*, __ F. Supp. 2d __, 2006 WL 266570 (D.D.C. Feb. 6, 2006) (Urbina, J.)

[2]    This defense applies not only to Secretary Rumsfeld, but also to related-action defendants Lieutenant General Ricardo Sanchez, Colonel Janis Karpinski, and Colonel Thomas Pappas. Appropriate *Westfall* Act certifications have been filed pursuant to 28 U.S.C. § 2679(d)(1) certifying that each of these defendants was acting within the scope of his or her federal employment in regard to the international law claims against them.  *See* Ex. 1, Certifications of Scope of Employment.  Accordingly, the United States must be substituted for the individual defendants on these claims in this action and in the related actions.

foreign country, 28 U.S.C. § 2680(k).  Plaintiffs' fifth cause of action is also subject to dismissal

for failure to state a claim because the Geneva Convention does not give rise to judicially

enforceable rights.

Finally, Plaintiffs' sixth cause of action seeking declaratory relief must be dismissed

because Plaintiffs have no standing under Article III to pursue prospective relief.  A plaintiff

must show a real and immediate threat of future injury to have standing to seek declaratory relief.

Plaintiffs have not pled, and they cannot show, that they face a real and immediate threat of again

suffering the claimed injuries for which they seek relief.

## ARGUMENT

I. **PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION, WHICH ALLEGE VIOLATIONS OF CONSTITUTIONAL RIGHTS, SHOULD BE DISMISSED ON BOTH SPECIAL FACTORS AND QUALIFIED IMMUNITY GROUNDS**

A. **Special Factors Preclude the Creation of an Implied Right of Action Under the Constitution**

The "special factors" doctrine, developed by the Supreme Court in *Bivens* and its

progeny, precludes any constitutional claim for damages against Secretary Rumsfeld in this case.

In *Bivens*, the Court held that the victim of an alleged Fourth Amendment violation could sue for

damages, even though no statute created a cause of action, where there were "no special factors

counseling hesitation" against the judicial creation of a remedy.  403 U.S. at 396.  In subsequent

years, the Court has recognized a *Bivens* remedy on just two occasions and, in both instances, the

Court specifically determined that there were no "special factors counseling hesitation" against

its recognition of a remedy that Congress had not taken affirmative action to create.  *See Carlson*

*v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979).

In the twenty-five years since *Carlson*, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).  For instance, in *Bush v. Lucas*, 462 U.S. 367 (1983), the Supreme Court refused to recognize a *Bivens* remedy for the alleged violation of First Amendment rights arising out of federal personnel decisions for fear that the claim might interfere with a statutory scheme regulating the federal workplace.  *See also Schweiker v. Chilicky*, 487 U.S. 412 (1988) (rejecting a *Bivens* remedy for the denial of Social Security benefits because a statutory procedure already existed to challenge adverse eligibility determinations).  In *Chappell v. Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*, 483 U.S. 669 (1987), the Court refused to create a *Bivens* remedy for alleged constitutional torts arising incident to military service for fear that such a claim would adversely impact order and discipline in the military.  In *FDIC v. Meyer*, 510 U.S. 471 (1994), the Court refused to allow a *Bivens* claim against a federal agency because of its potential impact on federal fiscal policy. Most recently, in *Malesko*, the Supreme Court refused to recognize a *Bivens* remedy against private companies performing governmental functions under contract with the United States because doing so would not serve the public policy purposes of the remedy.  534 U.S. at 68.  As a result of these Supreme Court decisions, there now "is a 'presumption against judicial recognition of direct actions for violations of the Constitution by federal officials or employees.'"  *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005) (quoting *McIntosh v. Turner*, 861 F.2d 524, 526 (8th Cir. 1988)).

Plaintiffs seek a radical extension of *Bivens* into a wholly new context, an extension that would be far more expansive and invasive than those rejected in *Lucas, Chilicky*, *Chappell*,

*Stanley*, *Meyer*, and *Malesko*. Plaintiffs seek a rule that would do nothing less than give aliens, potentially including alien enemy combatants, the power to force the Secretary of Defense and other leaders of our armed forces to defend themselves in federal lawsuits complaining about the conditions of the aliens' detention – and do so during ongoing warfare. No court ever has held that a constitutional right even *exists* under circumstances like those presented here. To recognize a non-statutory damages remedy in this context would be inconsistent with the separation of powers and, specifically, the political branches' authority over military and national security matters. Moreover, when Congress recently legislated concerning the proper treatment of detainees held in U.S. custody abroad, Congress chose not to create a civil damages remedy and to rely instead on other mechanisms to ensure that proper standards of treatment are enforced. Finally, recognizing a *Bivens* remedy would lead to highly invasive and impractical judicial review of an array of traditional military decisions.

1.      The Constitution delegates authority over decisions related to military and national security affairs to the Executive Branch, *see* U.S. Const. art. II, § 2, cl. 1, and Congress, *see id.* art. I, § 8, cls. 1, 11-16. Recognizing this, the Supreme Court has traditionally been loath to interfere in such "core" executive and legislative functions. *See, e.g., Hirabayshi v. United States*, 320 U.S. 81, 93 (1943) (where "conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of warmaking, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically

5

accountable for making them."); *North Dakota v. United States*, 495 U.S. 423, 443 (1990)

("When the Court is confronted with questions relating to . . . military operations, we properly

defer to the judgment of those who must lead our Armed Forces in battle.").

    The lower federal courts have been careful to follow this lead. *See, e.g.*, *El-Shifa Pharm.*

*Indus. Co. v. United States*, 378 F.3d 1346, 1369 (Fed. Cir. 2004), *cert. denied,* 125 S. Ct. 2963

(2005) ("[W]e are loath to add to the President's calculus concerns regarding [constitutional]

liability when he exercises his power as Commander-in-Chief"); *Van Tu v. Koster*, 364 F.3d

1196, 1198 (10th Cir.), *cert. denied*, 125 S. Ct. 88 (2004) (finding "availability of a *Bivens*

remedy" to challenge conduct of U.S. military officers during the Vietnam War to be

"questionable"); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926-27 (D.C.

Cir. 2003), *cert. denied*, 540 U.S. 1104 (2004) ("It is [] well-established that the judiciary owes

some measure of deference to the executive in cases implicating national security, a uniquely

executive purview."); *Khalid v. Bush*, 355 F. Supp. 2d 311, 329 (D.D.C.) (Leon, J.) ("[T]he

Court's role in reviewing the military's decision to capture and detain a non-resident alien is, and

must be, highly circumscribed."), *appeal docketed*, No. 05-5063 (D.C. Cir. Mar. 4, 2005);

*Bancoult v. McNamara*, 370 F. Supp. 1, 13 (D.D.C. 2004) (Urbina, J.) ("Foreign policy decisions

concerning the conduct of our military operations . . . do not merely touch the realm of foreign

affairs but rather involve serious political questions not within the province of the judicial

branch."), *appeal docketed*, No. 05-5049 (D.C. Cir. Feb. 22, 2005).[3]

---

[3]    Even in times of *peace* federal courts have broadly deferred to the Executive Branch on
military and other, non-military, national security matters. *See, e.g.*, *Dep't of Navy v. Egan*, 484
U.S. 518, 530 (1988) ("courts traditionally have been reluctant to intrude upon the authority of
the Executive in . . . national security affairs"); *People's Mojahedin Org. v. Dep't of State*, 182
F.3d 17, 23 (D.C. Cir. 1999) (determinations regarding national security raise non-justiciable

There can be no doubt that, in contravention of these settled constitutional principles, Plaintiffs wish to enmesh this Court in an extensive re-examination and second-guessing of Executive Branch judgments about military and national security issues. This country is currently deeply engaged in military actions in Afghanistan and Iraq, actions specifically authorized by Congress. *See* Auth. for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001); Auth. for Use of Military Force, Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002). Plaintiffs' allegations are directly related to these military actions in Afghanistan and Iraq. Plaintiffs are all aliens who were captured and detained by U.S. military forces in either Afghanistan or Iraq, *see* Am. Compl. ¶ 16, and Plaintiffs allege that they were mistreated at the hands of U.S. soldiers as a direct result of military "orders" given by superiors in the chain of command, including the Secretary of Defense and other high-ranking military officers. *See, e.g.,* Am. Compl. ¶¶ 40-44.

The United States is unaware of any authority allowing such extensive judicial intrusion

---

issues); *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) ("harm produced" by assertion of damages actions against federal officials "is particularly severe in the national security field, since 'no governmental interest is more compelling'"); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 270 n.27 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743) (dismissing claims for equitable relief because they concerned "foreign and national security policy directives of the President").

Likewise, even *outside* of military and national security contexts, courts traditionally have deferred to the Executive Branch on foreign policy matters. *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (recognizing "policy of case-specific deference to the political branches" in foreign affairs and "strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990) (highlighting "significant and deleterious consequences" that the creation of a damages action would have on "foreign policy operations"); *Dist. No. 1, Pacific Coast Dist. v. Maritime Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000) (holding that Executive Branch's "judgments on questions of foreign policy and national interest" were "not subjects fit for judicial involvement").

into war-making functions, let alone a decision creating a non-statutory damages remedy for alien detainees dissatisfied with the military's wartime detention practices. To the contrary, the Supreme Court has expressly taught that "Executive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout history, essential to war-time security." *Johnson v. Eisentrager*, 339 U.S. 763, 774 (1950).

In fact, federal courts have repeatedly refused to extend *Bivens* and other forms of tort liability into areas far less invasive of core war-related functions. Just last month, in *Arar v. Ashcroft*, __ F. Supp. 2d __, 2006 WL 346439 (E.D.N.Y. 2006), the court refused to imply a *Bivens* remedy against senior Executive Branch officials on allegations that the officials "ordered [plaintiff's] removal to Syria for the express purpose of detention and interrogation under torture by Syrian officials." *Id.* at *1. The plaintiff, a Canadian citizen who was detained by U.S. officials at John F. Kennedy Airport while en route from Tunisia to Montreal, alleged procedural and substantive due process violations. *Id.* at *6. The court observed that the case raised "crucial national-security and foreign policy considerations" and that "extending a *Bivens* remedy 'could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest.'" *Id.* at *29 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273-74 (1990)). Critical to the court's reasoning was the deference the judiciary owes to federal officials when they act in the international realm:

> [T]here is a fundamental difference between courts evaluating the legitimacy of actions taken by federal officials in the domestic arena and evaluating the same conduct when taken in the international realm. . . . In the international realm, [] most if not all judges have neither the experience nor the background to adequately and competently define and adjudge the rights of an individual vis-à-vis the needs of the officials acting to defend the sovereign interests of the United States . . . .

*Arar*, 2006 WL 346439 at *30. Accordingly, courts should not undertake "the task of balancing individual rights against national-security concerns" unless the political branches, "in whom the Constitution imposes responsibility for our foreign affairs and national security," have determined that "judicial oversight is appropriate." *Id.* at *31.

In *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743), plaintiffs brought tort claims against former Secretary of State Henry Kissinger and the United States for alleged common-law torts and violations of international law, including "summary execution, torture, [and] cruel, inhumane, or degrading treatment," based upon a coup d'etat in Chile allegedly orchestrated by senior Executive Branch officials. *See Schneider*, 412 F.3d at 191. The D.C. Circuit ruled that all the claims were non-justiciable under the political question doctrine, *id.* at 193, and the constitutional principles upon which the court rested its decision are highly instructive. The court specifically stayed its hand because the Constitution commits national security operations to the political branches. *Id.* at 193-98. In doing so, the court contrasted the broad powers afforded the political branches with the limited powers afforded the judiciary. "[T]here [can] be no doubt that decision-making in the fields of foreign policy and national security is textually committed [by Articles I and II] to the political branches of government." *Id.* at 194. Article III, on the other hand, "provides no authority for policymaking in the realm of foreign relations or provision of national security." *Id.* at 195. Accordingly, the determination of "whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of

adjudication, but of policymaking." *Id.* at 197.[4]

The D.C. Circuit's decision in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), is also directly applicable. Several of the plaintiffs in *Sanchez-Espinoza* were non-resident aliens who sought "redress for tortious injuries to themselves or their families at the hands of the Contras in Nicaragua." *Id.* at 205. They brought *Bivens* claims against numerous senior U.S. officials, including the President and the Secretaries of Defense and State, alleging that the officials provided "financial, technical, and other support" to the Contras that resulted in the "summary execution, murder, abduction, torture, rape, [and] wounding" of "innocent Nicaraguan civilians." *Id.* The court held that judicial deference to the Executive in matters of foreign policy and military affairs precluded recognition of the plaintiffs' *Bivens* claim:

> We have no doubt that [] considerations of institutional competence preclude judicial creation of damage remedies here. Just as the special needs of the armed forces require the courts to leave to Congress the creation of damage remedies against military officers for allegedly unconstitutional treatment of soldiers . . . so also the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad.

*Id.* at 208-09 (citations omitted). The court went on to emphasize the inappropriateness of damages actions by aliens aimed at altering U.S. foreign policy:

> The foreign affairs implications of suits such as this cannot be ignored – [especially] their ability to produce what the Supreme Court has called in another

---

[4]   Because the Supreme Court's special factors decisions in effect create a presumption *against* creating non-statutory *Bivens* claims in any new context, *see supra* at 4, the threshold for dismissal under the special factors doctrine is far lower than under the political question doctrine. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206, 208 (D.C. Cir. 1985) (declining to address political question doctrine while rejecting a *Bivens* claim on special factors grounds, because special factors analysis "relate[s] not to the merits of the particular remedy, but 'to the question of who should decide whether such a remedy should be provided'") (quoting *Bush*, 462 U.S. at 380). The *Schneider* court's admonitions thus apply here, *a fortiori*.

> context 'embarrassment of our government abroad' through 'multifarious
> pronouncements by various departments on one question.' . . . Whether or not the
> present litigation is motivated by considerations of geopolitics rather than
> personal harm, we think that as a general matter the danger of foreign citizens
> using the courts in situations such as this to obstruct the foreign policy of our
> government is sufficiently acute that we must leave to Congress the judgment of
> whether a damage remedy should exist.

*Id.* at 209 (citations omitted).

The Supreme Court's *Verdugo* decision, though not applying the special factors doctrine,

further illustrates the need to apply that doctrine to avoid the threat to national security that

would be posed by permitting non-resident aliens to sue Executive Branch officials for actions

taken abroad:

> For better or for worse, we live in a world of nation-states in which our
> Government must be able to "function effectively in the company of sovereign
> nations.". . . Situations threatening to important American interests may arise
> halfway around the globe, situations which in the view of the political branches of
> our Government require an American response with armed force. *If there are to
> be restrictions on searches and seizures which occur incident to such American
> action, they must be imposed by the political branches through diplomatic
> understanding, treaty, or legislation.*

494 U.S. at 275 (emphasis added, citations omitted). No different result should obtain here.

**2.**    Under special factors analysis, separation of powers principles also require

judicial deference to congressional judgment regarding the appropriate remedies for harms

inflicted on persons such as Plaintiffs. *See Malesko*, 534 U.S. at 69; *Sanchez-Espinoza*, 770 F.2d

at 208 (special factors doctrine "relate[s] not to the merits of the particular remedy, but 'to the

question of who should decide whether such a remedy should be provided'") (quoting *Bush*, 462

U.S. at 380). Congress has addressed this issue in two pieces of legislation that specifically

address the proper treatment of aliens detained abroad. *See* Nat'l Def. Authorization Act for

11

Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (to be codified at 10 U.S.C. § 801, note and 42 U.S.C. § 2000dd) ("Detainee Treatment Act"); Ronald W. Reagan Nat'l Def. Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (codified at 10 U.S.C. § 801, stat. note §§ 1091-92) ("Reagan Act").  In Section 1092 of the Reagan Act, Congress created a detailed regime designed to prevent unlawful treatment of military detainees abroad.  *See* 10 U.S.C. § 801, stat. note § 1092.  Congress authorized the Department of Defense to implement this regime.  *See id.*  Notably, Congress entrusted punishment of those accused of unlawful treatment of detainees to the military judicial system, and chose not to lodge such authority or responsibility in the judicial department.  *See id.* at § 1091(a)(4)-(5).  *See also Khalid*, 355 F. Supp. 2d at 325 n.18.[5]

In Section 1403 of the Detainee Treatment Act, also known as the "McCain amendment," Congress made clear that all persons under control of the U.S. government, regardless of location, may not be subjected to cruel, inhuman, or degrading treatment.  *See* Detainee Treatment Act, 119 Stat. at 3474-75.  Congress, however, did not create a cause of action to enforce the section.  The author of the legislation, Senator John McCain, specifically recognized that the legislation does not create a private cause of action.  *See* 151 Cong. Rec. S14269 (daily ed. Dec. 21, 2005) (statement of Sen. McCain) ("this bill [does] not create a private right of

---

[5]    In doing so, Congress made a specific finding that "the Armed Forces are moving swiftly and decisively" to punish the unlawful treatment of detainees at the Abu Ghraib prison in Iraq and stated that it is the "policy of the United States to . . . investigate and prosecute, as appropriate, all alleged instances of unlawful treatment of detainees in a manner consistent with the international obligations, laws or policies of the United States."  10 U.S.C. § 801, stat. note § 1091(a)(4), (b)(2).  *See also* 151 Cong. Rec. S14273 (statement of Sen. Cornyn) ("The perpetrators of [the Abu Ghraib] crimes are now being prosecuted, and the military has undertaken comprehensive reforms to prevent future abuses.").

action"). *See also id.* (statements of Sens. Graham, Levin and Warner, recognizing that the

legislation does not create a private right of action). The legislative history reflects Congress's

intent that Section 1403 be enforced, not through private tort suits, but through the military

justice system. *See* 151 Cong. Rec. S14261 (statement of Sen. Kyl) ("[The McCain] amendment

directly regulates military officers and is enforced through the usual mechanisms of military

discipline."); 151 Cong. Rec. S14262 (statement of Sen. Graham) ("These standards of treatment

are important, but they need to be enforced through the military's internal systems of

accountability and Congressional oversight, not through lawsuits and adversarial proceedings

brought by detainees.").[6]

Congress's decision not to create a private cause of action in either piece of legislation

thus was carefully considered and far from "inadvertent." Accordingly, the Court should defer to

congressional judgment on the remedial measures necessary to prevent detainee abuse and the

congressional finding that the military justice system is the appropriate mechanism to address

allegations of abuse. *See Chilicky*, 487 U.S. at 423 (directing courts to stay their hand when it

appears that Congress's failure to create a private right of action "has not been inadvertent. When

the design of a Government program suggests that Congress has provided what it considers

adequate remedial mechanisms for constitutional violations that may occur in the course of its

administration, we have not created additional *Bivens* remedies."). Indeed, the Supreme Court

indicated in *Malesko* that a *Bivens* remedy should not be extended into an area where Congress

has had the opportunity to create a private right of action, but declined to do so. *See Malesko*,

---

[6]    Congress did recognize that Section 1403 does not foreclose a cause of action that may already exist under "other statutes," such as "a claim under the Alien Tort Statute." 151 Cong. Rec. S14269 (statements of Sens. Warner and Levin).

534 U.S. at 67 & n.3 (stating the Supreme Court has "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one"). *Accord Arar*, 2006 WL 346439 at *31 ("Without explicit legislation, judges should be hesitant to fill an arena that, until now, has been left untouched - perhaps deliberately - by the Legislative and Executive branches.")

Not incidentally, the Reagan Act already has led this Court to decline to review Executive Branch decisions regarding the detention of aliens abroad. *See Khalid*, 355 F. Supp. 2d at 329. Relying in part on the "[c]onspicuous . . . absence in the Reagan Act [of] any reference by Congress to federal court review where United States personnel engage[] in impermissible treatment of a detainee," the Court in *Khalid* refused to issue a writ of habeas corpus to persons held at Guantanamo Bay, Cuba. *Khalid*, 355 F. Supp. 2d at 329-30. The analysis in *Khalid* is fully consistent with the special factors doctrine, which requires judicial deference to the political branches' constitutional authority to conduct war. *Compare Khalid*, 335 F. Supp. 2d at 329 ("The Founders allocated the war powers among Congress and the Executive, not the Judiciary. As a general rule, therefore, the judiciary should not insinuate itself into foreign affairs and national security issues.") *with Sanchez-Espinoza*, 770 F.2d at 209 ("[T]he special needs of foreign affairs must stay our hand in the creation of damages remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad.").[7]

---

[7]    This Court specifically noted in *Khalid* that the separation of powers prevents the judiciary from "engag[ing] in a substantive evaluation of the conditions of [alien detainees'] detention," noting that "it is the province of the Executive branch and Congress, should it choose to enact legislation relating thereto, to define the conditions of detention and ensure that the United States laws and treaties are being complied therewith." *Khalid*, 355 F. Supp. 2d at 328. Congress has in fact done what the court suggested in enacting Section 1403 of the Detainee Treatment Act. Indeed, as with the political question doctrine, *see supra* at 10 n.4, the special factors doctrine

14

**3.**     The novel and sensitive duties that Plaintiffs seek to impose on the judiciary to oversee and review the military's war-making activities themselves constitute another factor counseling against the recognition of a *Bivens* remedy.  Recognizing a *Bivens* remedy here would directly interfere with military decision-making because it would effectively cede to the judiciary the authority to define how military detainees must be confined and cared for overseas during wartime.  That would involve such concerns as the security requirements that may be imposed at detention facilities and the appropriate assignment of military resources to the task – sensitive military judgments that are outside the expertise and traditional role of the courts.  Yet Plaintiffs would have domestic courts become the fora for resolving how the military's detention policies and practices are implemented worldwide, in places as far-flung as the Safid Mountains of Afghanistan and the Euphrates river valley in Iraq.  Plaintiffs would require witnesses and defendants to drop their military activities abroad to appear in federal courts to defend themselves and their comrades in arms.[8]

The creation of a tort remedy also would impose a significant burden on the military to implement that remedy, leading to even further judicial supervision.  The very task of providing

---

applies here *a fortiori* to the considerations that led the court in *Khalid* to defer to the political branches, because this case involves non-statutory *Bivens* claims rather than petitions for habeas corpus.

[8]     The difficulties that would arise if a *Bivens* remedy were recognized here would be more extensive even than those that would arise out of claims purely challenging the legality of detention.  Unlike such claims, which were at issue in *Eisentrager*, conditions of confinement claims are significantly broader and may be brought, as here, against military personnel in their individual capacity seeking damages from them personally.  Recognizing conditions of confinement claims would likely involve the courts in significant, ongoing litigation over living conditions in overseas military detention facilities, potentially even as to detainees whose enemy combatant status is undisputed.

alien military detainees confined overseas with access to courts and attorneys in the United States would be fraught with security concerns and could absorb significant military resources. *Cf. Eisentrager*, 339 U.S. at 779 (noting specific logistical burdens on military that would "hamper the war effort" and "divert [the] efforts and attention [of field commanders] from the military offensive abroad" if habeas proceedings by alien prisoners of war were permitted).

Finally, implying a damages remedy here would create a paradoxical, and unjustifiable, result. U.S. soldiers are barred from bringing *Bivens* actions for injuries arising out of their military service, *see Stanley*, 483 U.S. at 682-83, while Plaintiffs seek to allow aliens whom U.S. soldiers capture abroad to sue U.S. military personnel. *Cf. Eisentrager*, 339 U.S. at 783 (stating that it would be a "paradox" if what the court denied "our own soldiers" it granted to "enemy aliens in unlawful hostile action against us"). Rather than confer a right of action "on all of the world except Americans engaged in defending it," *id.* at 784, this Court instead should find that the exclusive constitutional authority of the Executive and Legislative branches over the military is a special factor precluding recognition of the *Bivens* claims that Plaintiffs seek to bring.

### B.    Qualified Immunity Bars Plaintiffs' Constitutional Claims

Plaintiffs seek in their *Bivens* claims to recover damages from the personal resources of Secretary Rumsfeld (and the three related-action Army defendants) rather than from the coffers of the U.S. Treasury. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The courts have long recognized that such individual-capacity actions "entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

In recognition of these costs, qualified immunity provides that "government officials

16

performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established legal rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) ("Where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences'"); *see also Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998). Fundamentally, qualified immunity is a "fair notice" requirement, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), which is intended to protect governmental officials from suit unless they are "plainly incompetent or knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). *See also Zweibon v. Mitchell*, 720 F.2d 162, 172-73 (D.C. Cir. 1983) (defining a clearly established right as an "indisputable" or "unquestioned" right). Where the law did not provide government officials with clear notice that their alleged actions would violate the Constitution, qualified immunity provides the officials with sweeping protection from the entirety of the litigation process; it is not merely a defense to liability. *See Harlow*, 457 U.S. at 818. The qualified immunity inquiry accordingly must be resolved at the earliest possible stage of the litigation. *See id.* at 817; *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996).

In order to overcome qualified immunity, a plaintiff must demonstrate that the constitutional right in question was clearly established in the circumstances at the time of the alleged conduct. This is a high threshold, as illustrated by two Supreme Court decisions: *Anderson v. Creighton*, 438 U.S. at 635, and *Saucier v. Katz*, 533 U.S. 194 (2001). These decisions stress two key points: (1) if the constitutionality of an official's conduct was at least debatable, the official is protected by qualified immunity, and (2) the right in question must be

17

defined in terms of the official's specific actions rather than as an abstract matter.

*Anderson* involved a Fourth Amendment claim asserted against an FBI agent for participating in the warrantless search of a home. *See* 483 U.S. at 637. The Eighth Circuit rejected qualified immunity on the ground that the law was clearly established that a warrantless search of a home is permissible only upon a showing of probable cause and exigent circumstances, the existence of which remained in dispute in the case. *Id.* at 638. The Supreme Court reversed, holding that qualified immunity may not be denied based upon abstract legal principles without regard to the "objective legal reasonableness" of the defendant's particular conduct under the circumstances. *Id.* at 639. To overcome qualified immunity, the plaintiff had to allege facts known to the defendant establishing that no officer in his position could reasonably have believed that his conduct was constitutional. *See id.* at 640-41.

In *Saucier v. Katz*, the Supreme Court reversed a decision denying qualified immunity to a military police officer who allegedly used excessive force in arresting a protester. The Court explained that courts must conduct a two-step qualified immunity inquiry. *Saucier*, 533 U.S. at 201. First, courts must determine whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* If a constitutional violation is properly alleged, courts must then determine "whether the right was clearly established . . . in light of *the specific context* of the case, [and] *not as a general proposition . . . .*" *Id.* (emphasis added). The *Saucier* Court held that the officer was entitled to immunity because the constitutionality of his actions was at least debatable:

> A reasonable officer in petitioner's position could have believed that hurrying respondent away from the scene, where the Vice President was speaking and respondent had just approached the fence designed to separate the public from

18

the speakers, was within the bounds of appropriate responses . . . [N]either respondent nor the Court of Appeals has identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did, nor are we aware of any such rule.

*Id.* at 208-09.[9]

Applying the qualified immunity test to Plaintiffs' Fifth and Eighth Amendment claims in the present case, there is no question that the claims must be dismissed. Plaintiffs have failed to allege a violation of any constitutional right, let alone the violation of a constitutional right that was clearly established in the circumstances.

1.    Plaintiffs' claim that their Eighth Amendment rights were violated in the course of their detention is easily resolved. It is axiomatic that the Eighth Amendment protects only convicted prisoners from cruel or excessive punishment for their crimes. *See Bell v. Wolfish*, 441 U.S. 520, 579 (1979) (Eighth Amendment only "protects individuals *convicted of crimes* from punishment that is cruel and unusual") (emphasis added); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 850-51 (1998). Since Plaintiffs were detainees at military detention facilities outside the United States and not convicted prisoners serving a sentence, they cannot assert an Eighth Amendment claim.

2.    Plaintiffs' constitutional claims also should be rejected because it cannot reasonably be argued that Executive Branch officials were on notice that their alleged decisions regarding the detention of non-resident aliens in combat theaters would violate the Constitution. The Supreme Court and the circuit courts, including the D.C. Circuit, have consistently held that

---

[9]    *Accord, e.g., Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

constitutional protections do not extend to non-resident aliens abroad.  *See, e.g., Verdugo-Urquidez*, 494 U.S. at 269-74; *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."); *Eisentrager*, 339 U.S. at 784-90; *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens."); *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182-83 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1299 (2005) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."); *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*, 820 F.2d 1359, 1363 (4th Cir. 1987) ("The Constitution does not extend its guarantees to nonresident aliens living outside the United States.").[10]

In *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd sub nom. Rasul v. Bush*, 542 U.S. 466 (2004), the D.C. Circuit held that detainees at Guantanamo Bay were not

---

[10]    Qualified immunity analysis, consistent with its notice function, generally looks to the caselaw of the Supreme Court and the circuit where the challenged acts occurred to determine whether officials were on clear notice that their acts would violate the Constitution.  *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) (immunity applied where no "controlling authority" in the jurisdiction indicating challenged acts unlawful); *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) ("[I]f a right is recognized in some other circuit, but not this one, an official will ordinarily retain the immunity defense.").  Because Plaintiffs' claims against Secretary Rumsfeld challenge decisions made at the Pentagon (if within the United States at all), applicable Fourth Circuit caselaw is particularly relevant in determining whether Secretary Rumsfeld was on clear notice that his alleged acts would violate Plaintiffs' constitutional rights.  As the *Vancouver Women's Health Collective* decision indicates, the Fourth Circuit has long recognized that constitutional protections do not extend to non-resident aliens, and there is no Fourth Circuit decision involving remotely analogous claims that could have put Secretary Rumsfeld on notice that he could face claims such as Plaintiffs'.

entitled to habeas corpus because it could not "see why, or how, the writ may be made available to aliens abroad when basic constitutional protections are not." 321 F.3d at 1141.  The court further stated:  "If the Constitution does not entitle the detainees to due process, *and it does not*, they cannot invoke the jurisdiction of our courts to test the constitutionality or the legality of restraints on their liberty." *Id*. (emphasis added).  *Al Odah* was decided in March 2003, prior to the time periods when Plaintiffs allege they were detained.  *See* Am. Compl. ¶¶ 16-25.  Thus, at the time of Plaintiffs' detention the D.C. Circuit had explicitly ruled that non-resident aliens detained abroad were not entitled to constitutional protections.

Plaintiffs may argue that when the Supreme Court held in *Rasul v. Bush*, 542 U.S. 466 (2004) *("Rasul I")* that detainees confined at Guantanamo Bay could pursue habeas corpus relief in federal court, it implicitly overruled the long line of Supreme Court and circuit court precedent holding that constitutional protections do not extend to non-resident aliens abroad.  Even if this were true, and as explained below it is not, the *Rasul I* decision could not save Plaintiffs' *Bivens* claims in this case.  Plaintiffs acknowledge in their complaint that they were released from detention by June 2004, *before* the Supreme Court issued its decision in *Rasul* on June 29, 2004. *See* Am. Compl. ¶¶ 17-25.  As previously discussed, qualified immunity shields government officials from liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known at the time of the conduct.  *Harlow*, 457 U.S. at 818-19; *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993).  Federal officials cannot be held liable based on developments in the law after their actions.  *See DeBauche v. Trani*, 191 F.3d 499, 505-06 (4th Cir. 1999); *Bailey v. Bd. of County Comm'rs of Alachua County, Fla.*, 956 F.2d 1112, 1123 (11th Cir. 1992) ("In deciding whether a constitutional right is clearly established, we

21

must judge the contours of the law at the time the [] decision was being made, irrespective of subsequent developments in the law.").

 This Court recently applied this rule in *Rasul v. Rumsfeld*, __ F. Supp. 2d __, 2006 WL 266570 (D.D.C. Feb. 6, 2006) (Urbina, J.) ("*Rasul II*"), and held that Secretary Rumsfeld and several senior Army officers were entitled to qualified immunity on claims similar to those here. The plaintiffs in *Rasul II* were former Guantanamo Bay detainees who allege they were subjected to "various forms of torture" while detained at the facility, and that "executive members of the United States government are directly responsible for the depraved conduct the plaintiffs suffered over the course of their detention." *Rasul II*, 2006 WL 266570 at *1. The court held that at the time of the plaintiffs' detention, from February 2002 to March 2004, the law did not clearly establish that constitutional protections applied to the plaintiffs. *Id.* at *14-15. Indeed, the Court observed that the law established otherwise – that the decisions in *Eisentrager* and *Verdugo-Urquidez* "indicate that the Constitution applies only once aliens were within the territory of the United States and developed substantial contacts in this country." *Id.* at *15. Not until the Supreme Court decided *Rasul I* was there any "indication that detainees [at Guantanamo Bay] may be afforded a degree of constitutional protection," and even *Rasul I* did nothing more than create "unsettled" questions regarding the "nature of Guantanamo detainees' constitutional rights in American courts." *Id.* Accordingly, the court ruled that the defendants were entitled to qualified immunity because no case law "support[s] a conclusion that military officials would have been aware, in light of the state of the law at the time, that detainees should be afforded the

22

rights they now claim." *Id.*[11]

  **3.**  Even if *Rasul I* had been decided prior to Plaintiffs' release, it would not

overcome Secretary Rumsfeld's qualified immunity. *Rasul I* did not hold that non-resident aliens

detained abroad have constitutional rights enforceable under *Bivens*. Instead, the Supreme Court

expressly avoided the complex problems raised by extraterritorial application of the Constitution

and limited its decision instead to the "narrow" question of statutory jurisdiction over the

detainees' habeas actions under 28 U.S.C. § 2241. *Rasul I*, 542 U.S. at 470, 475. *See also*

*Hamdan v. Rumsfeld,* 415 F.3d 33, 37 (2005), *cert. granted*, 126 S. Ct. 622 (2005) (noting

"'narrow' question" decided by *Rasul I*); *Khalid*, 355 F. Supp. 2d at 323 (*Rasul I* "only

answer[ed] the question of jurisdiction, and not the question of whether these same individuals

possess any substantive rights on the merits of their [constitutional] claims"). The Court focused

on the discrete issue of the United States' "jurisdiction and control" over Guantanamo Bay

pursuant to agreements with Cuba and relied on the fact that the habeas statute would apply to

U.S. citizens held at Guantanamo Bay. *Rasul I*, 542 U.S. at 480-81. The Court also noted that

nothing in the text of the habeas statute indicated that Congress sought to exclude non-resident

aliens from its provisions. *Id.* at 481. These factors led the Court to conclude that the

presumption against extraterritorial application of statutes did not apply to the habeas statute and

to hold that non-resident aliens detained at Guantanamo Bay are entitled to the procedures

afforded by that statute. *Id.* at 480-84. None of these issues is present in this case, where

Plaintiffs all were held at detention facilities in Afghanistan and Iraq, not at Guantanamo Bay,

---

[11] The court in *Rasul II* refrained from deciding whether constitutional protections apply to aliens detained at Guantanamo because the issue is currently before the D.C. Circuit. *Id.* at *12.

and none of them is seeking habeas relief.[12]

The Supreme Court's focus on the unique nature of Guantanamo Bay in *Rasul I* actually undercuts any claim by Plaintiffs in this case.  The Court's holding that the habeas statute applied at Guantanamo Bay was based on a finding that Guantanamo Bay is functionally within the "territorial jurisdiction" of the United States for purposes of that habeas statute by virtue of treaties and a special history.  *See* 542 U.S. at 480-81.  Here, Plaintiffs were held at detention facilities in Afghanistan or Iraq, places unquestionably *not* within the territorial jurisdiction of the United States, so Plaintiffs can take no comfort in any dispute concerning the precise status of Guantanamo Bay.  Further, any argument that *Rasul I* extended constitutional protections to non-resident aliens detained at facilities other than Guantanamo Bay presupposes that *Rasul* overruled *Eisentrager*, which the Court made clear that it did not do.  *See Rasul*, 542 U.S. at 475-76, 484.

**4.**    Although Judge Urbina in *Rasul II* did not decide the question whether aliens detained at Guantanamo Bay are afforded any constitutional protections at all, Judge Leon of this Court addressed this question in *Khalid v. Bush* and concluded that "non-resident aliens captured and detained outside the United States have no cognizable constitutional rights."  *Khalid*, 355 F. Supp. 2d at 320.  Judge Leon explained that:

> The petitioners in this case are neither United States citizens nor aliens located within sovereign United States territory.  To the contrary, they are non-resident aliens, captured in foreign territory, and held at a naval base, which is located on land subject to the "ultimate sovereignty" of Cuba. [citation omitted]  Due to their

---

[12]    Legislation recently was enacted that prohibits detainees at Guantanamo Bay from filing habeas corpus petitions to challenge their confinement.  *See* Detainee Treatment Act, 119 Stat. at 3476-79.  The legislation amended 28 U.S.C. § 2241 to supersede *Rasul I*'s interpretation of the statute as encompassing Guantanamo Bay.  *See* 151 Cong. Rec. S14260, 67 (statements of Sen. Kyl) (describing *Rasul I* as "without precedent" and "utterly impractical," and noting that Section 1405 of the Detainee Treatment Act "legislatively overrule[s] *Rasul*").

status as aliens outside sovereign United States territory with no connection to the United States, it was well established prior to *Rasul* that the petitioners possess no cognizable constitutional rights.

*    *    *

Nothing in *Rasul* alters [that prior analysis]. . . . The Supreme Court majority in *Rasul* expressly limited its inquiry to whether non-resident aliens detained at Guantanamo have a right to a judicial review of the legality of their detention under the habeas statute, . . . and, therefore, did not concern itself with whether the petitioners had any independent constitutional rights.

*Id.* at 321, 322.  Exactly the same reasoning applies to Plaintiffs' constitutional claims here.[13]

Secretary Rumsfeld respectfully suggests that Judge Leon's decision in *Khalid* correctly analyzes the question whether non-resident aliens held abroad in military detention facilities possess rights under the U.S. Constitution.  But regardless of how the D.C. Circuit rules in the future on the question whether aliens detained at Guantanamo Bay are entitled to constitutional

---

[13]    This is not to suggest that *Khalid* is unchallenged on this issue.  Judge Green of this Court reached a contrary conclusion in another habeas case and held that Guantanamo Bay "must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply," and that aliens detained there have cognizable rights under the Fifth Amendment.  *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005), *appeal docketed*, No. 05-5124 (D.C. Cir. Mar. 31, 2005).  Judge Green relied heavily on the Supreme Court's finding in *Rasul I* that the circumstances of U.S. control over Guantanamo Bay, discussed *supra* at 23-24, make the facility equivalent to sovereign U.S. territory and not "a typical overseas military base." *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d at 462.  Judge Green did not hold, or even suggest, that constitutional protections extend to aliens, such as Plaintiffs here, detained abroad in places other than Guantanamo Bay.  Moreover, and despite her holding, Judge Green acknowledged the "continuing murkiness" surrounding the concept of extraterritorial application of the U.S. Constitution, *id.* at 458 n.27, and certified her decision for interlocutory appeal under 28 U.S.C. § 1292(b), *see* Civil Action No. 02-CV-0299 et al., Docket No. 162, Certification Order and Stay (Feb. 3, 2005).  The D.C. Circuit subsequently accepted that certification. *See Al Odah v. United States*, No. 05-5064 (D.C. Cir. notice of appeal Mar. 7, 2005).  This establishes that both Judge Green and the D.C. Circuit recognize that there is "substantial ground for difference of opinion" on a "controlling question of law,"  28 U.S.C. § 1292(b).  The law cannot be considered clearly established under these circumstances even as to claims by Guantanamo detainees, much less detainees in other parts of the world.

protections, qualified immunity is required here for the same reasons as in *Rasul II*, and additionally, because these Plaintiffs were never detained at Guantanamo Bay in any event. The law did not "clearly establish" that Plaintiffs possessed Fifth or Eighth Amendment rights at the time Secretary Rumsfeld made decisions regarding military detention of non-resident aliens such as Plaintiffs in Afghanistan and Iraq. Indeed, even today the D.C. Circuit recognizes that "there is doubt that someone in Hamdan's position [a detainee at Guantanamo Bay] is entitled to assert [] a constitutional claim." *Hamdan*, 415 F.3d at 37 (citing *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999), and *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002)). Under these circumstances, Secretary Rumsfeld is entitled to qualified immunity.[14]

## II.    SECRETARY RUMSFELD AND THE RELATED-ACTION DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY ON PLAINTIFFS' THIRD, FOURTH, AND FIFTH CAUSES OF ACTION ALLEGING INTERNATIONAL LAW VIOLATIONS

Plaintiffs' third and fourth causes of action are claims for damages under the Alien Tort Statute. The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the

---

[14]    That non-resident aliens abroad lack Fifth Amendment rights does not mean that U.S. officials lawfully may abuse detainees on foreign soil. To the contrary, it is prohibited as a matter of federal criminal law to torture or conspire to torture any person, including persons in U.S. custody, whether detained within or without the United States. *See, e.g.,* 18 U.S.C. § 2340A(a) ("Whoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life."); 18 U.S.C. § 2340A(c) (same, conspiracy). Even before Congress recently established uniform standards for the treatment of detainees held abroad, the United States had convened more than ten Courts-Martial, including seven General Courts-Martial, out of Abu Ghraib alone. The United States is also prosecuting civilian contractors for mistreating detainees in their custody. *See, e.g., United States v. Passaro*, No. 04-cr-211 (E.D.N.C.) (ongoing prosecution of contractor for abusing detainee in Kunar Province of Afghanistan).

United States." 28 U.S.C. § 1350.  In their fifth cause of action, Plaintiffs seek damages for alleged violations of the Geneva Conventions.[15]  The *Westfall* Act makes plain, however, that the exclusive remedy for these claims is a suit against the United States under the FTCA.  *See* 28 U.S.C. § 2679(b)(1), (d)(1).

Under section 2679(b)(1), a plaintiff's sole remedy for a claim for damages arising from any "negligent or wrongful act or omission" of a federal employee acting within the scope of his or her employment is a suit against the United States under the FTCA.  28 U.S.C. § 2679(b)(1).  *See also United States v. Smith*, 499 U.S. 160, 163 (1991); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 264 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743).[16]  Upon certification by a designee of the Attorney General that the individual employee acted within the scope of his employment, the United States is substituted in place of the individual defendant.  28 U.S.C. § 2679(d)(1).  *See also Bancoult*, 370 F. Supp. 2d at 6.  As part and parcel of this substitution, Secretary Rumsfeld is absolutely immune from suit for the alleged international law violations pleaded in counts three, four, and five.  *See* 28 U.S.C. § 2679(b)(1) ("civil action[s] or proceeding[s] . . . against the

---

[15]    Plaintiffs allege violations of the "Third and Fourth Geneva Conventions."  Am. Compl. ¶ 257.   The Third Convention pertains to treatment of prisoners of war, and the Fourth Convention pertains to treatment of civilians during wartime.  *See* Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516.

[16]    The D.C. Circuit did not address the *Westfall* Act immunity issues ruled on by the district court in *Schneider*, on the ground that its resolution of all claims under the political question doctrine was "jurisdictional [and therefore] determinative."  *Schneider*, 412 F.3d at 193.

27

employee or the employee's estate [are] precluded").[17]

The *Westfall* Act provides only two exceptions to the rule that the FTCA is the exclusive remedy and the federal employee is immune. That rule does not apply to: (1) claims brought "for a violation of the Constitution of the United States" – that is, *Bivens* claims like those pleaded by Plaintiffs in counts one and two; or (2) claims brought "for a violation of a statute of the United States . . . ." 28 U.S.C. § 2679(b)(2). All other claims against federal employees based upon conduct undertaken within the scope of federal employment are barred by the Act. *See, e.g., Smith*, 499 U.S. at 166-67 (refusing to infer another exception beyond the two expressly stated in the *Westfall* Act).

Plaintiffs' claims under the ATS and Geneva Conventions do not fall within either exception to the *Westfall* Act's rule of absolute immunity. As the Supreme Court made clear in *Sosa v. Alvarez-Machain*, "the ATS is a jurisdictional statute creating no new causes of action." 542 U.S. 692, 724 (2004). This court has specifically held that the ATS "does not confer rights nor does it impose obligations or duties" that can be "violated" for purposes of the *Westfall* Act. *See Rasul II*, 2006 WL 266570 at *10; *accord Bancoult*, 370 F. Supp. 2d at 9. The ATS merely affords the jurisdictional basis for the assertion of rights conferred elsewhere, namely by the law of nations or a U.S. treaty. *See Alvarez-Machain*, 542 U.S. at 724; *Rasul II*, 2006 WL 266570 at

---

[17]  The Attorney General has delegated his authority to certify scope of employment to any Director of the Torts Branch, Civil Division. *See* 28 C.F.R. § 15.4(a). Timothy P. Garren, a Torts Branch Director, has certified that Plaintiffs' claims are based upon actions taken by Secretary Rumsfeld, Lieutenant General Sanchez, Colonel Karpinski, and Colonel Pappas in the scope of their federal office. *See* Ex. 1, Certifications of Scope of Employment. Consistent with these certifications and the arguments set forth herein, the United States should be substituted in place of Secretary Rumsfeld, Lieutenant General Sanchez, Colonel Karpinski, and Colonel Pappas with respect to Plaintiffs' third, fourth, and fifth causes of action in each of the related actions pending before this Court.

*9; *Bancoult*, 370 F. Supp. 2d at 9-10.  A claim brought under the ATS is not a claim brought

"for a violation of" the ATS, 28 U.S.C. § 2679(b)(2), and thus is "not exempt from the exclusive

remedy provision of the [*Westfall*] Act."  *Alvarez-Machain v. United States*, 331 F.3d 604, 631

(9th Cir. 2003), *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

*Accord Rasul II*, 2006 WL 266570 at *4-11 (substituting the United States in place of individual

defendants on ATS claims); *Bancoult*, 370 F. Supp. 2d at 9-10 (same); *Schneider*, 310 F. Supp.

2d at 266-67 (same).[18]

Substitution also is required on Plaintiffs' fifth cause of action because Plaintiffs' claim

for alleged violation of the Geneva Conventions likewise is not a claim "for a violation of the

Constitution . . . or . . . for a violation of a statute of the United States."  *See* 28 U.S.C. §

2679(b)(2)(B).  Treaties adopted by the United States may be part of the "law of the land,"

*see Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996), but a tort claim based directly

---

[18]    The scope of employment certification upheld by the court in *Rasul II* is nearly identical to
the certification made here.  In *Rasul II*, Judge Urbina upheld certifications for Secretary
Rumsfeld and several military officers regarding their involvement in the alleged development
and implementation of harsh interrogation techniques at Guantanamo Bay.  In reaching its
holding, the court noted that "the defendants' [alleged] actions are inextricably intertwined with
their respective roles in the military," and that nothing in the complaint indicated "the defendants
had any motive divorced from the policy of the United States to quash terrorism around the
world."  2006 WL 266570, at *8.  Likewise, in *Bancoult*, the court upheld certifications for
several current and former officials in the Departments of Defense and State concerning their
involvement in the forced removal of a native population from an island in the Indian Ocean
because the challenged activities "were undertaken by each of the individual defendants to
further the U.S. government's national security interests, not their personal interests."  370 F.
Supp. 2d at 8.  And in *Schneider*, the district court upheld a certification that former National
Security Advisor Henry Kissinger was acting within the scope of his employment when he
allegedly committed human rights violations in support of a coup d'etat in Chile because his
conduct affected the establishment of a socialist government in Chile which "would have had a
substantive impact on U.S. foreign policy and would naturally implicate national security
concerns for which Dr. Kissinger had some responsibility."  310 F. Supp. 2d at 265-66.

upon a treaty does not constitute a claim for the violation of the Constitution or a federal statute

as required by the *Westfall* Act.[19]  This is especially clear given the Supreme Court's

interpretation of the exceptions to the *Westfall* Act.  *See Smith*, 499 U.S. at 173-74.  In *Smith*, the

Court held that "Congress' express creation of these two exceptions [for claims for violations of

the Constitution and federal statutes] convinces us that the Ninth Circuit erred in inferring a third

exception" to the *Westfall* Act.  *Smith*, 499 U.S. at 167.  Indeed, the *Rasul II* court held that a

claim alleging violations of the Geneva Conventions was not within either *Westfall* Act

exception and substituted the United States in place of the individual defendants.  *See Rasul II*,

2006 WL 266570 at *4-11.  This Court should likewise reject Plaintiffs' attempt to create a third

exception for claims for violations of treaties.

Upon the substitution of the United States on Plaintiffs' third, fourth, and fifth causes of

action in accordance with the *Westfall* Act, dismissal of the resulting FTCA claims is required.

The *Westfall* Act provides that when the United States is substituted for an individual defendant,

the resulting claim is "subject to the limitations and exceptions applicable to" FTCA claims.  28

U.S.C. § 2679(d)(4).  In this case, Plaintiffs have not satisfied the jurisdictional requirements for

proceeding on an FTCA claim.  An essential prerequisite to the pursuit of an FTCA claim is the

exhaustion of all administrative remedies.  *See* 28 U.S.C. § 2675(a) ("An action shall not be

instituted upon a claim against the United States for money damages . . . unless the claimant shall

have first presented the claim to the appropriate Federal agency and his claims all have been

---

[19]    It should be noted that the distinction between federal constitutional, statutory, and treaty
provisions is expressly recognized in the Constitution.  The Supremacy Clause states: "This
Constitution, and the Laws of the United States which shall be made in pursuance thereof; *and
all Treaties* made, or shall be made, under the Authority of the United States, shall be the
Supreme Law of the Land . . ." U.S. Const. art. VI, cl. 2 (emphasis added).

finally denied by the agency in writing"); *McNeil v. United States*, 508 U.S. 106, 112 (1993).

*Accord Bancoult*, 370 F. Supp. 2d at 10-11; *Schneider*, 310 F. Supp. 2d at 266-67. This

requirement is jurisdictional. *See* 28 U.S.C. § 2675(a); *Jackson v. United States*, 730 F.2d 808,

809 (D.C. Cir. 1984); *Schneider*, 310 F. Supp. 2d at 269. Since Plaintiffs have not exhausted

their administrative remedies, this Court lacks subject matter jurisdiction over their FTCA

claims. *See* 28 U.S.C. § 2675(a); *McNeil*, 508 U.S. at 112; *Rasul II*, 2006 WL 266570 at *11.[20]

### III.  PLAINTIFFS' FIFTH CAUSE OF ACTION FAILS BECAUSE THE GENEVA CONVENTIONS DO NOT GIVE RISE TO JUDICIALLY ENFORCEABLE RIGHTS

In addition to this Court's lack of jurisdiction over Plaintiffs' fifth cause of action, the

D.C. Circuit's holding in *Hamdan v. Rumsfeld* that the Geneva Conventions do not afford private

parties judicially enforceable rights requires dismissal of the fifth cause of action for failure to

state a claim. Applying the long-established presumption that treaties do not create judicially

enforceable rights, *see, e.g., Head Money Cases*, 112 U.S. 580, 598 (1884) ("judicial courts have

nothing to do and can give no redress" to individuals seeking enforcement of a treaty), the court

in *Hamdan* rejected a claim asserted in a habeas petition filed by a Guantanamo Bay detainee

seeking to enforce the Third Geneva Convention – the 1949 Geneva Convention Relative to the

Treatment of Prisoners of War. *Hamdan*, 415 F.3d at 40.[21] The court observed that enforcement

of treaties generally rests with the signatory states, not individuals:

---

[20]    In addition, even if Plaintiffs were to satisfy the administrative claim requirement, counts three, four, and five would be barred by, *inter alia*, 28 U.S.C. § 2680(k), which precludes "[a]ny claim arising in a foreign country." Plaintiffs' alleged injuries occurred in Iraq and Afghanistan, and the Supreme Court in *Sosa* expressly held that Section 2680(k) bars a claim where the plaintiff's injury occurs in a foreign country. 542 U.S. at 712.

[21]    Plaintiffs also seek to enforce the Third Convention. *See supra* at 27 n.15.

> [T]his country has generally negotiated treaties with the understanding that they
> do not create judicially enforceable rights. As a general matter, "a treaty is
> primarily a compact between independent nations," and "depends for the
> enforcement of its provisions on the interest and honor of the governments which
> are parties to it." If a treaty is violated, this "becomes the subject of international
> negotiations and reclamation," not the subject matter of a lawsuit.

*Id.* at 38-39 (citations omitted). Thus, even treaty provisions that directly benefit private persons

"'generally do not create private rights or provide for a private cause of action in domestic

courts.'" *Id.* at 39 (quoting Restatement (Third) of the Foreign Relations Law of the United

States § 907 cmt. a, at 395 (1987)).

The D.C. Circuit observed that these principles guided the Supreme Court in *Eisentrager*,

where the Court rejected the plaintiffs' argument that the military commission that convicted

them violated the 1929 Geneva Convention. *Id.* at 39 ("[R]esponsibility for observance and

enforcement of [rights identified in the Convention] is upon political and military authorities."

*Eisentrager*, 339 U.S. at 789 n.14). Finding no material distinctions between the 1929

Convention at issue in *Eisentrager* and the 1949 Convention at issue in *Hamdan*, both of which

protect individual rights and commit enforcement of their provisions to signatory states, the D.C.

Circuit held that the plaintiff in *Hamdan* could not enforce the Geneva Convention in federal

court. *Hamdan*, 415 F.3d at 39-40. The same result is required here.

Any argument Plaintiffs may make in an attempt to distinguish *Hamdan* on the grounds

that it was a habeas proceeding, and thus did not specifically address whether an implied right of

action exists under the Geneva Conventions, would be unavailing. The Geneva Conventions that

Plaintiffs allege were violated commit enforcement of their terms to signatory parties and provide

specific remedies available only to those parties.[22]  Thus, there is no basis for concluding that the

Conventions' language "displays an intent to create not just a private right but also a private

remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

## IV.    PLAINTIFFS LACK ARTICLE III STANDING TO SEEK DECLARATORY RELIEF

Because Plaintiffs do not state a claim for which relief can be granted on their first,

second, and fifth causes of action, and because this Court lacks subject matter jurisdiction over

Plaintiffs' third, fourth, and fifth causes of action, there is no basis for Plaintiffs to obtain the

declaratory relief they seek in their sixth cause of action.  In any event, Plaintiffs may not seek

declaratory relief because they have no standing to seek such prospective relief.

Article III limits the subject matter jurisdiction of federal courts to actual "cases or

controversies."  *See* U.S. Const. art. III, § 2, cl. 1.  The case or controversy requirement is not

satisfied unless a plaintiff has standing.  *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S.

26, 37-38 (1976).  To satisfy the standing requirement, a plaintiff must plead: (1) that the plaintiff

suffered an injury in fact that is concrete and not conjectural, (2) that the injury is fairly traceable

---

[22]    Articles 1, 11 and 132 of the Third Geneva Convention and Articles 1, 12 and 149 of the
Fourth Geneva Convention specify that enforcement rests with the signatory parties and that
alleged violations are to be resolved by the parties.  Article 1 of both Conventions provides that
each party must "undertake to respect and to ensure respect for the present Convention in all
circumstances." *See* 6 U.S.T. at 3318, 3518.  Article 11 of the Third Convention and Article 12
of the Fourth Convention provide that "in cases of disagreement between the Parties to the
conflict as to the application or interpretation of the provisions of the present Convention, the
Protecting Powers shall lend their good offices with a view to settling the disagreement."  6
U.S.T. at 3326, 3526.  (In recent times, the role of the "protecting power" has been performed by
the International Committee of the Red Cross.  In 1949, it was typically performed by a neutral
state.)  Article 132 of the Third Convention and Article 149 of the Fourth Convention provide
that "[at] the request of a Party to the conflict, an enquiry shall be instituted, in a manner to be
decided between the interested Parties, concerning any alleged violation of the Convention."  6
U.S.T. at 3420, 3618.

to the actions of the defendant, and (3) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Util. Air Regulatory Group v. EPA*, 320 F.3d 272, 277 (D.C. Cir. 2003). Even where a plaintiff has standing to seek retrospective relief such as damages, the plaintiff must make a separate and different showing to have standing to seek prospective relief such as a declaratory judgment. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-06 (1983); *Federal Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995). Allegations of past injury are insufficient for a plaintiff to obtain declaratory relief; rather, there must be an imminent threat of future injury that would be redressed by the specific equitable relief sought. *See Lyons*, 461 U.S. at 102-03; *Fraternal Order of Police v. Rubin*, 134 F. Supp. 2d 39, 41 (D.D.C. 2001).

Because declaratory relief is prospective, courts are particularly vigilant in applying the injury-in-fact and redressability requirements to such claims to ensure that the plaintiff is suffering present harm that a declaratory judgment could redress or faces likely and imminent future harm that a declaratory judgment could avert. *See, e.g., Lyons*, 461 U.S. at 102-04 (plaintiff must show substantial likelihood of concrete future harm that would be redressed by equitable relief); *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1272 (D.C. Cir. 1994) (no standing to seek declaratory relief where plaintiffs did not allege "that they are threatened with any future illegality"); *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985) (plaintiff seeking declaratory relief must show a "real and immediate" threat of future injury); *Buie v. Jones*, 717 F.2d 925, 929 (4th Cir. 1983) (absent reasonable probability that plaintiff will again be injured, plaintiff would not "be harmed or benefitted by" a declaratory judgment).

34

The requirement of an imminent threat of future injury as a jurisdictional prerequisite to equitable relief is aptly illustrated by the Supreme Court's decision in *City of Los Angeles v. Lyons*. The plaintiff in *Lyons* sued the City of Los Angeles and four of its police officers for injuries he allegedly sustained when he was stopped for a traffic violation and placed in a chokehold. He sought injunctive and declaratory relief as well as damages, and the lower courts issued a preliminary injunction barring the use of chokeholds. 461 U.S. at 97-100. The Supreme Court reversed, holding that the plaintiff lacked standing to seek equitable relief because he failed to show that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id*. at 105. The Court held that, even if the plaintiff's prior injury afforded him standing to seek retrospective relief in the form of damages, it did "nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him to unconsciousness without any provocation or resistance on his part." *Id*.[23]

The standing principles set forth in *Lyons* have led courts in this and other circuits repeatedly to dismiss declaratory relief claims by prisoners and former detainees seeking to challenge the conditions of confinement at facilities where they are no longer held. In *Dorman v. Thornburgh*, 955 F.2d 57, 58 (D.C. Cir. 1992), the D.C. Circuit held that a prisoner who had been paroled lacked standing to obtain a declaration that a prison regulation was unconstitutional.

---

[23] The Court also made clear in *Lyons* that "a real and immediate threat" of future injury could not be demonstrated with broad, conclusory allegations. The Court stated in that regard: "The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between the parties." *Id.* at 105.

35

Similarly, the Eighth Circuit in *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985), held that

a prisoner who had been transferred to a new facility lacked standing to challenge the conditions

of confinement at the facility where he was previously detained.  And in *Stewart v. McGinnis*, 5

F.3d 1031, 1038 (7th Cir. 1993), the Seventh Circuit held that a prisoner lacked standing to

challenge a practice at a facility where he had been housed because he "is no longer [at the

facility], nor is there any indication that he will be returned to [the facility] any time in the future;

therefore, [plaintiff] is under no immediate threat of harm from official conduct at [the facility]."

Likewise, in *Buie v. Jones*, the Fourth Circuit held that a prisoner lacked standing to challenge a

visitation rule in place at the jail where he was a pretrial detainee because there was not "any

reasonable probability that within the foreseeable 'immediate' future" the plaintiff would again

be housed at the facility.  717 F.2d at 928-29.  *Cf. Scott v. District of Columbia*, 139 F.2d 940,

941 (D.C. Cir. 1998) ("Normally, a prisoner's transfer or release from a prison moots any claim

he might have for equitable relief arising out of the conditions of his confinement in that

prison.").[24]  Even where a prisoner remains at the same facility and seeks to challenge a condition

the prisoner is no longer experiencing, there is no standing to seek equitable relief.  *See Knox v.*

*McGinnis*, 998 F.2d 1405, 1413 (7th Cir. 1993) (prisoner could not obtain injunction against

---

[24]     *Accord Barney v. Pulsipher*, 143 F.3d 1299, 1306 & n.3 (10th Cir. 1998) (former inmates
lacked standing to seek declaratory or injunctive relief as to conditions in jail because they failed
to show, and the court "decline[d] to speculate," that they "will likely end up" there "again some
time in the future"); *Nelsen v. King County*, 895 F.2d 1248, 1250, 1252 (9th Cir. 1990) (former
residents of alcoholic-treatment center lacked standing to seek injunctive relief because they
could not show that they would "begin drinking uncontrollably several years after their discharge
from the Center," "commit an alcohol-related offense, be prosecuted for that offense, be
convicted, be offered the choice to reenter the Center, make that choice, *and* find that the
conditions at the Center were the same as they allegedly were when [plaintiffs] were there"
previously).

future use of "black box" restraining device, as it was only used in segregation, prisoner had

returned to general population, and the "mere possibility" that he "may sometime in the future be

returned to the segregation unit" did not "establish a real and immediate threat that he again will

be subject to use of the black box").

There can be no question that Plaintiffs lack standing to seek declaratory relief with

respect to the conditions of their detention at military facilities in Afghanistan and Iraq.

Plaintiffs were not detained when they filed this action, nor are they detained today.  Even if

Plaintiffs could demonstrate *past* exposure to unlawful conditions of confinement, they cannot,

as they must, show that they face a real and immediate threat of *future* exposure to those same

conditions.  Plaintiffs fail to allege any facts suggesting that they face a real and imminent threat

of being detained again.  Plaintiffs' few allegations pertaining to the possibility of future

detention are based on nothing more than speculation that they *may* be captured and detained in

the future.  *See* Am. Compl. ¶¶ 176, 180, 184, 188 (individuals who allegedly harbor animosity

toward Plaintiffs "may again make false reports that would result in Plaintiff[s'] arrest and

detention"); ¶¶ 193, 198, 203, 207 (fear of future detention based on "continuing" and "frequent"

"sweeps" of Baghdad by "U.S. and Iraqi forces"); ¶ 210 (fear of future detention based solely on

past detentions).  But even if Plaintiffs were to be detained again, their supposition that they

would again be subject to the same harsh conditions of confinement alleged in the complaint is

pure speculation (particularly in light of the recently enacted legislation that prohibits "cruel,

inhuman or degrading" treatment of persons in the custody of the United States, *see supra* at 12).

At bottom, Plaintiffs' allegations are simply attempts to show that Plaintiffs reasonably fear

future detention and abuse.  But the Supreme Court made clear in *Lyons* that allegations of a

"reasonable" fear of future injury are insufficient to establish standing to seek prospective relief:

> The reasonableness of [plaintiffs'] fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct.  It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.

*Lyons*, 461 U.S. at 107 n.8 (emphasis in original).

In sum, Plaintiffs allege no facts remotely suggesting that any of the allegedly unlawful actions they seek to challenge are likely to be taken against them in the future.  Accordingly, Plaintiffs lack standing to pursue declaratory relief and their sixth cause of action must be dismissed.

## CONCLUSION

For the foregoing reasons, Secretary Rumsfeld and the United States respectfully request that this Court dismiss all of Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

Dated: March 6, 2006                          Respectfully submitted,

                                              PETER D. KEISLER
                                              Assistant Attorney General

                                              NEIL M. GORSUCH
                                              Principal Deputy Associate Attorney General

                                              JEFFREY S. BUCHOLTZ
                                              Deputy Assistant Attorney General

                                              TIMOTHY P. GARREN
                                              Director
                                              Torts Branch, Civil Division


                                              _____/s/_____
                                              J. MARCUS MEEKS (D.C. Bar No. 472072)
                                              Trial Attorney
                                              UNITED STATES DEPARTMENT OF JUSTICE
                                              Torts Branch, Civil Division
                                              P. O. Box 7146
                                              Ben Franklin Station
                                              Washington, D.C. 20044
                                              (202) 616-4176 (voice)
                                              (202) 616-4314 (fax)

                                              Attorneys for Defendant Secretary of Defense
                                              Donald H. Rumsfeld and the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2006, I caused a copy of the foregoing **Defendant's and the United States' Motion to Dismiss** and the **Memorandum of Points and Authorities in Support of Defendant's and the United States' Motion to Dismiss** and exhibits thereto to be served upon counsel of record via ECF and electronic mail as follows:

Arthur B. Spitzer
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036
artspitzer@aol.com
*Counsel for Plaintiffs*

Mark E. Nagle
Troutman Sanders LLP
401 Ninth St, N.W., Ste. 1000
Washington DC 20004
mark.nagle@troutmansanders.com
*Counsel for Defendant Thomas Pappas*

Stephen L. Braga
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
stephen.braga@bakerbotts.com
*Counsel for Defendant Ricardo Sanchez*

Michael L. Martinez
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
mmartinez@crowell.com
*Counsel for Defendant Janis Karpinski*

_____/s/_____
J. Marcus Meeks